Good afternoon, Your Honors. May it please the Court, Amanda Waterhouse for Petitioner Miguel Angel Montiel Rubio. The petitioner in this matter seeks asylum, withholding of removal, and protection under the Convention Against Torture. Although he most recently entered the United States as a nonimmigrant, intending only to visit the U.S. and return to his home country, events that transpired subsequent to his nonimmigrant entry compelled him to remain in the United States and to seek asylum rather than returning to Venezuela. Although that event was the tipping point for Petitioner's decision to remain in the U.S. and to seek asylum and related humanitarian relief, it was merely the culmination of a crisis that had happened to Petitioner over a period of approximately four years, beginning in 2015. Rather than that being the only cause for Petitioner's decision not to return, it was when he was finally informed that the government of Venezuela, particularly the colectivos working with the government, had identified him, come to his home and said, we got you. We got him. So believing at that point that the government of Venezuela, acting through their paramilitary arm, had identified him, Petitioner then determined to remain in the United States. Petitioner's history of political activism dates back to 2010. In 2010, Petitioner joined the Primero Justicia Party, which was opposed to what was then the Chávez regime, although later, of course, Maduro replaced Chávez in approximately 2013. He started participating in political protests in approximately 2010, up until the time of his final departure from his home country in June of 2019. He estimates, roughly, that he participated in as many as 40 political protests of varying size and intensity during his overt political activism in the country of Venezuela. In 2015, things took a turn more serious for Petitioner. At that time, he was working within the political party Primero Justicia. He was tasked with organizing transportation to the polls in connection with a national election, the election for the National Assembly. While he was walking back to his assigned tasks, from taking a break with another group of activists, wearing the colors of Venezuela, shouting, free Venezuela. At that time, two men pulled up on a motor cycle. One of the men pulled a gun, pointed it at the Petitioner, and said, take that so you'll stop messing with us. And I won't use the word, I assume your owners are familiar with the record, but of course, the language was much more coarse. He shot Petitioner high on his leg. It required immediate medical care. He was taken to a hospital. The next day, they performed surgery. Surgery required the implantation of a metal plate and multiple screws in respondent's leg. He was then bedridden for approximately four months before beginning to slowly regain his ability to walk. Starting in three minute increments training with a walker, Petitioner eventually worked his way up to ten minutes. And then over a period of two months, continued re-ambulating before finally after seven months, he walked, albeit still with a limp. During that time, during his convalescence, he lived at his home for a period of approximately a year after he was shot. When he returned home in December of 2016, he immediately resumed his political activities. In July of 2017, following again another contentious election, the Petitioner was participating in mass protests, and specifically his role at that point was in his particular neighborhood, manning roadblocks and barricades that had been set up to prevent the colectivos from entering these residential areas and harming the anti-Maduro supporters who lived there. While he was working at the barricade, the colectivos overran Petitioner's position. He had to flee as they threatened to burn him alive. Further, during the protests, which took place over a number of days, and the subsequent administrative crackdown by the Maduro regime, Petitioner was repeatedly threatened with physical harm that the colectivos would find their homes and break into them and harm them in a variety of ways. Following this protest, it came to light that one of Petitioner's pro-Maduro neighbors, who was something of a community organizer, her house had been burned down by a group of dissidents, and it appeared that there was an attempt to implicate the Petitioner in the arson against her home. Having had nothing to do with it, and yet fearing unlawful reprisals, the Petitioner went into hiding. He remained in hiding for another year during this four-year period. Finally, leaving the family member's home where he had been hiding, he returned. And once again, believing in a free Venezuela, believing that there was something to be done to preserve democracy, Petitioner begins protesting again. The final year, or the final portion of a year that Petitioner spent in his country, he resumed protesting in January of 2019. In February of 2019, he attended a protest where helicopters were surveilling the crowd. Later that month, an additional protest, he was near an area where police were taking photos of the protesters in attempts to identify them. In April of 2019, he was at a protest where he was shot at with tear gas canisters and had to flee the security authorities of the Venezuelan government. But all of those most recent instances, and I appreciate you going through the factual history of this, what the PIA found or concluded was these weren't targeting the Petitioner. These were just general repressive efforts by the government. In other words, when he was in these protests, they weren't firing tear gas at him. They were firing tear gas into the crowd, and they were not taking pictures of him. They were taking pictures of the crowds. And I realized that could lead to something, but again, we're here under a substantial evidence standard of review. And how are we to discount what the immigration judge and the PIA found that basically he wasn't a high enough or high enough profile opposition leader to really credibly allege that he or prove that he'd been targeted. And it was more general than that. Well, so your Honor, I guess my response to that would first be to ask for clarification. When we talk about asylum law, there is conflicting authority as to which standard of review applies where. For example, this court has long held that it was a legal question whether certain acts gave rise to a finding that past persecution had occurred that were severe enough to be persecution. And at other times, the court has appeared to apply substantial evidence to that very same question. Certainly the court has always applied substantial evidence to fact findings, and many of the board and immigration judge's conclusions in the context of asylum law are traditionally considered to be subject to that substantial evidence. What's our standard here? Because I would say in regard to past persecution, our standard here is clearly going to be this is a legal question. This is a de novo review. In regard to specific factual findings, the standard of review is obviously substantial evidence. But all those findings I thought that the PIA made or the IJ made were factual in nature. In other words, they didn't add up to past persecution or a credible fear of future persecution. But I mean, that rests on fact findings of what happened. So, Your Honor, in this instance, Petitioner would posit that the ultimate determination of whether undisputed facts rise to the level of persecution is a question of law. And again, there's a circuit split on this. The Fifth Circuit has conflicting precedent on this exact issue. For example, Morales v. Session has held that that's a pure question of law. But Gitanji v. Barr held that the substantial evidence standard would apply. It's actually an issue that's currently pending at the Supreme Court. And Orias v. Oriana, which is case number 24-777, cert grante, has not yet been argued. All that said, surely you're not arguing that we do de novo review on immigration cases. I would definitely argue, Your Honor, that on some particular legal questions presented by immigration cases, this court, in fact, does do de novo review. To ask you the most obvious question, give me a citation for the case which says, that with the record presented as it is here, that we're doing de novo review of all those facts below, et cetera. I get your point about the ultimate determination is legal. But you cite the case that says, whichever otherwise, that given the way this case is presented, we're doing any kind of de novo review. That'll be news to me. Your Honor, I'm merely, and I suppose we're very much splitting hairs here, I'm stating that the factual findings are subject to the substantial evidence. I'm not discounting. You're doing your job. So do not take my question any other way. But my antenna goes off if you start saying de novo review on an immigration case. I understand what you're saying. Ultimately, whether he's entitled to relief or not, yes, it's a legal question. But to Judge Wilson's point, we get the case. The BIA had it. They found him credible. They didn't deny that he was involved in this activity, et cetera. Factually, it shows there were periods when he was in Venezuela where nothing happened. And so they discern with, yes, there were targeted periods, but there were periods where he weren't pointed out. We get all these cases about the conditions of the country, et cetera. And so that's the way the case comes to us, which is the point that Wilson is raising. So what then is the legal error here within all of those facts? If it's your argument that we should come to a different conclusion than they did, that's not working. Well, Your Honor, and again, the fact findings as I have conceded are subject to a substantial evidence standard. In this matter, respondents should succeed or be successful under either standard. The record here is almost overwhelming as to the actions taken by the Maduro regime to combat dissidents, to crack down on protesters. This is not just well-known person. The evidence and country conditions materials are replete with mass arrests of protesters, of arbitrary detention, of the colectivos being used to suppress democratic protests through violent means. And then upon detention, those protesters are then subject to torture. The UN concluded that the government of Venezuela is committing crimes against humanity. The United States Department of State, in country report after country report, has reported these arbitrary arrests, these arbitrary detentions. The IJ found that your client traveled frequently back and forth between Venezuela and USA, and that was a basis of the judge's finding that he didn't have, quote, a well-founded fear of persecution because he felt comfortable, my word, not his. But in other words, he didn't have a well-founded fear of persecution because he is moving between, and if he was really targeted or persecuted, he wouldn't have done it. And I'm just saying that's what I read. Am I misapprehending what it was correctly? Well, no, your honor. That essentially is what the immigration judge said. What the immigration judge ignores in that analysis is the turning point. When we started to present this argument, I made a point to this court that petitioner did not intend to seek asylum when he came to the United States. He testified repeatedly that he had come and visited. He had family here. He always went back. He wanted to go back to his country. He loves his country. He had a business there, a home there. He had every intention to go back. What changed was that while he was in the United States, a neighbor contacted him and said, hey, they came to your house. They shot their guns in the air. They said, we got him. We got the bald man. And when they realized that the neighbor was there, they looked at him and they said, oh, you're not him. They knew who they were looking for. It was that change. That is what compelled Respondent to conclude that he had come to the attention of authorities, that no matter how minor his participation might have been in the political process, he was now in the crosshairs. His identity was known. They came to his home. At that point, the calculus changes. You said he was there and went into hiding for a year. He must have gone to a different city. So if he goes back now, why can't he just go to a different town or a different city where no one knows him? Because, Your Honor, at that juncture in the tale here, his identity had not yet been discovered. There was no confirmation of who he was other than sort of general consequences of his participation. A specific identification hadn't been made and or he had no knowledge that he had been particularly identified. So even though he was hiding due to sort of a general fear fallout from that protest in 2017 and his issue with his neighbor, he had no reason to believe at that time that he was being particularly sought. It wasn't until the neighbor implicates him in burning down her house. She's pro Maduro and the neighbor doesn't have enough information to supply to the collectivos to basically convince him he's a target or give him grounds. He doesn't know this. He doesn't know this and he couldn't testify to this information because this was coming to him from other persons in the neighborhood who said people had been asking around about him possibly being involved. There was not an official accusation that he was aware of or anything like that. The mere potential to be involved in something like that was enough to put him in hiding for a year with a family member. Just being afraid of being implicated in was sufficient considering the environment and the circumstances on the ground in Venezuela. That was enough to scare him into going into hiding, leaving his home, leaving his business. So the situation for him was very serious then, but upon learning that he had been identified affirmatively by the paramilitary arm of the government or agents working for the Venezuelan government, that was the point where Petitioner knew he couldn't go home. That was the point where his objectively reasonable fear of future persecution crystallized. All right, in one sentence, tell me what it is. I mean, I hope the bottom line would be grant petition, but tell me succinctly in a declarative statement what it is the panel would hold in order to provide relief to your client. What are we holding? Your Honor, I would ask this panel to hold that the event that the harm that was visited Petitioner does rise to the level of past persecution, that there was an error by both the IJ and the BIA that he did not have an objectively reasonable fear of returning to his home country. I would ask that the decisions to deny both humanitarian asylum for lack of proving the past persecution and also withholding a removal for failure to meet the lower threshold for asylum, I would ask that those decisions be vacated and overturned because any positive decision on the first two points necessarily implicates the second two. And finally, I would ask this court, and I do apologize that we didn't get to get to it, I would ask this court to look at the Convention Against Torture analysis here and point to, again, the country condition materials where there are just hundreds of pages of confirmed instances of torture against not just the leader of the opposition, against everyday men and women who are fighting for democracy in their country. All right, thank you, ma'am. Thank you. All right, you saved your rebuttal time. Mr. George. May it please the court, Matthew George for the Attorney General. I want to jump in first to the standard of review question just to answer the court's questions about that. The court does have one case, Morales, which I believe my opponent discussed, saying that the standard of review for whether prior assault rises to persecution is de novo. However, the court addressed that in a subsequent case in Ghizzatani and said that the standard of review for past persecution is substantial evidence. And that's what the government's position is that the standard of review here is substantial evidence. I believe, as Judge Stewart pointed out, in many, many of the cases where the court is reviewing past persecution, a well-founded fear, that standard of review is substantial evidence. And applying that here, substantial evidence supports the agency's findings that Petitioner failed to show past persecution or harm rising to the level of past persecution and also failed to show a well-founded fear of future persecution. And how that ties into the things that he actually experienced, one thing he experienced here was a gunshot, which is standing alone sometimes could be quite bad. However, the court has explained that even brutal harm doesn't necessarily rise to the level of persecution. What's also necessary is a trying to persecute the petitioner or seeking him out and doing this repeatedly. And that's, if you look at the facts of Ghizzatani as compared to this case, it shows you that this is not past persecution. And that's because these are a series of isolated incidents. And they don't have necessarily just because there is one event of some rather significant harm, that standing alone doesn't make it rise to past persecution. Here we have a series of events happening over approximately four years. We do have the, it's almost the opposite of the typical fact pattern we see where the worst event, I would say, comes first, the gunshot. There, he's also in a group, he's not necessarily targeted himself. There just seems to be this group, some individuals come up and shoot him. But is there evidence that it wasn't the petitioner who was targeted? I mean, you've got, you couple that with the idea that they showed up to his house at least a couple times looking for him. I mean, doesn't that suggest that he in fact was targeted? Well, the key issue there, Your Honor, is who was they? There are two incidents where some people showed up. The first one is, it's not really clear who these people were. They did say they were looking for someone about an electric fence, and Petitioner does, or did, I guess, engage in that type of business in Venezuela. He was in sort of a security type of business. And so we can go back and forth, I guess. I'm sure my opponent will argue that they were looking for him. They weren't who they said they were, but there's also the possibility that this was a potential customer who was legitimately looking for Petitioner here. There's no evidence to suggest that that encounter was benign. All the feelings, all the witnesses, all the vibe, so to speak, was that this was somebody coming up to look for him, but not to buy an electric fence. I mean, that's really, that's very subjective, I guess, what the vibe is, and that's something for the agency to determine. And here they said that doesn't really add up to it. And now the court's looking at it. Does that compel the conclusion that this was sufficient harm to rise the level of persecution? Well, if all the evidence points in one direction, doesn't that compel the conclusion? What's all the evidence? The two events? He's shot. He's in hiding. He's accused because the neighbor's house gets burned down, and the colectivo or someone shows up a couple of minutes later, and they realize it's the neighbor, and then they leave. I mean, how else do you add that up? Well, we add it up like the court did in Ghijotani, where the events there happened closer in time than they did here. In the court there, there was an incident where the political opponents ripped flags away the second time they came to Ghijotani's house and beat him up, and then later he was on the way to vote, I believe, and they shouted at him again. And those happened just a mere months apart. Here, all these events that Your Honor has just laid out, they happened years apart. Well, because his recovery was a year from the first injury they inflicted, and then he went into hiding. Maybe that was overlapping. I guess the fact that the petitioner to extend the period by staying low and laying low, I mean, does that really help your case, or does it? I don't know. Well, yes, that's time he spent in the country. As Judge Clement pointed out, nothing happened to him while he was recovering. He went to his cousin's house. I don't know if that was ever described as hiding, but perhaps he did describe that as hiding. He just decided to go to his cousin's house, and he spent over a year there without any incident. He also, as I believe the court has pointed out, he's come to the United States multiple times, back and forth, and if these colectivos or whoever is seeking to harm him are government agents, the Venezuelan government is allowing him to come and go as he pleases, and he's coming here for months at a time, coming to the United States, and then voluntarily returning to Venezuela. All of those factors need to be considered, too, in terms of the court needs to look at the entire record, and those facts, as well as the facts that Your Honor pointed out, all go together in that substantial evidence review to reverse the agency's findings that have to compel the conclusion. So it's not just one way, certainly, of looking at them, is these four or five things happened to him. Another way of looking at it is look at the amount of time between them. Look at was this a sustained, systematic pattern against him specifically, not just, oh, I'm protesting things happen. Oh, some people came to my house four years after the first event. Those aren't the types of things that the court has said equate to a sustained, systematic pattern or effort of seeking out the individual. What do you do with the country condition evidence, which is more substantial than most countries in the world? Well, there again, it's about that individualized target. It certainly is bad in Venezuela and bad for political opponents of the Maduro regime. That doesn't mean that it's either more likely than not, or there's a well-founded fear of petitioner himself specifically will experience the conditions or the harm that's mentioned in those country conditions, that he still needs that individualized targeting, that he specifically will be harmed, not just someone like him or a political opponent or something like that. He needs to show he will experience those. That's the key issue for the court to look at, and whether evidence compels that conclusion, is whether he specifically will be targeted under these conditions and will experience harm rising to the level of persecution. It's easy to say that political dissidents or political opponents generally will experience it, and yes, there's no dispute that it's bad there for political opponents, but will he specifically, this petitioner here, experience harm rising to the level of persecution if he goes back? That could have been one factor that the agency said, yes, it does, but they said it didn't, and that doesn't, just because those conditions exist, doesn't compel the conclusion that petitioner specifically will be targeted and will experience that future harm. What's his status now? What's the petitioner's status? I believe he has temporary protected status right now that expires next month, but I am not confident on where temporary protected status for Venezuela stands right now, given there's a lot of ongoing litigation with it. So I believe he definitely has it until next month. His counsel may have more information about exactly where that stands. Whether he can extend that beyond next month is probably subject to litigation at this point. I guess looking at the threats that petitioner experienced as just one aspect of the past experiences he had, they were, again, general in nature. He was in a group, I think, as the court has already pointed out, in a lot of these incidents, he was in a group. In the first one, he was in a group where the police or the National Guard tear gassed him, where they were flying overhead and taking pictures. In all of these events, I think the key word is that individualized or targeted type of analysis. None of these has he really shown that he specifically was targeted. Now, there is the July 2019 incident where some individuals come to his house, appear to be looking for him specifically. As the immigration judge pointed out, though, we don't know who those individuals are. There's no evidence about were they colectivos, were they robbers? Who knows? We don't have any information about who they are. Even assuming they are colectivos or some agent of the government and they were seeking him out, one incident in 2019 doesn't compel the conclusion given all the other facts in this case. Again, he never was individually targeted. These events occurred over a period of at least four years. He's come back and forth to the United States multiple times without incident. He is able to go to other people's houses, his father's, his cousin's, and be there in safety for years at a time. Looking at all that together, this record doesn't compel the conclusion that he either experienced past harm rising to the level or will experience future harm rising to the level of persecution. A lot of that same analysis applies in the torture context. Again, his past harm, if it doesn't amount to persecution, it doesn't amount to torture. So he hasn't shown any past torture. And then a lot of those same factors apply looking to what's going to happen in the future, whether he's shown a likelihood of future harm rising to the level of torture. Those same things coming back and forth to the United States. The country conditions evidence, it's not good for political opponents. However, again, the court has said that it must be that individualized, targeted evidence, just showing, deciding general country conditions. Even when I say general, I don't necessarily mean not related to, say, political dissidents or something like that. It means not targeted to him specifically. Again, he's just pointing to general evidence. Well, that is bad. He needs to show what specifically will he experience in the future, and that harm, if he experiences harm, will either rise to the level of persecution or to torture. He's failed to do that here, and so the court should deny the petition. Unless the court has further questions, I feel like I'm just going to reiterate the points I've already made. How old is he? I believe he's 50-something, approximately. I don't have an exact age, Your Honor. All right. Thank you, sir. Thank you. Thank you. Your Honor, in response to your question, the respondent was born in 1954, so he is an elderly person at this point, and he currently does have temporary protected status. Elderly? I was born in 1950, so what you... Withdrawn, Your Honor. Your Honor, the petitioner was born in 1954. He does currently have temporary protected status. He's doing fine. He said elderly. He may have lost me. I might have to recuse now. I don't know. No, press ahead. Press ahead. Petitioner does have temporary protected status. However, it will terminate within the next month pursuant to the directives of the current administration. To briefly rebut what opposing counsel has raised before this court, I would remind everyone that credibility is not an issue here. There are no contested facts. There is no issue with petitioner's testimony. As Judge Wilson so ably pointed out, every bit of evidence points in the same direction here. What's the closest case? All cases are different, so don't get me wrong. I'm not saying where's the identical case. I know that doesn't exist, but as you well know, we have a range of cases. The mixtures, the countries are different. Here, as Judge Wilson mentioned, there's all kinds of evidence in here about countries. I mean, each case, and we try to look at them individually, but that said, what's the closest case you can think of where the petition was granted relief similar to what you're asking? I'm not asking for it to be the case that controls, but at least in terms of counsel opposite and talking about the case. Judge Yatani says, well, that panel had the threats of whatever were more focused, et cetera, et cetera, so he seeks to distinguish that. I'm just asking. I know you have a lot in the brief, but we like to really pay attention. If there's a close case, we really need to examine and see if it lines up, particularly where relief was granted, because most of these, as you know, petition is denied. Yes. Generally, Your Honor, when we've reached the appellate level, the odds are very much stacked against us. I would say factually, in regard to the past persecution question, the closest case on point is Tamara Gomez. It's a series of threats. Which one? Tamara Gomez, the Gonzales case. The court found there, even where there was no physical injury to the petitioner, that a series of escalating threats, coupled with the knowledge that persons similarly situated were being harmed, were actually receiving the results of those threats, was sufficient to demonstrate past persecution. Factually, on the persecution question, I think that Tamara Gomez is perfectly on point, although I can't say that that petitioner was ultimately successful. Regarding Giattani, that case involved a single assault and a few incidents of shouted threats. And while I very much agree that factually that was all politically motivated, the harm was, you know, albeit over a short period of time, the harm was really lesser than the harm that was experienced here. Petitioner was shot at close range. His injury required a year of recovery. And to the point of whether something is targeted, does the person who targets you have to know your full name for you to be the target? If petitioner is standing there, wearing his Venezuela hat, screaming, free Venezuela, and at that moment of expressing himself, someone says, that guy, let's get him. Let's shoot him for doing that. Is it any less targeted because they don't know his name when they do it? Somebody aimed that gun at him. It wasn't a random shooting. They chose him among the group of people to punish for his political opinion. That's targeting, even if they didn't know his name yet. More importantly, they know his name now. They have found his home. They have come looking for him. Credibility is not an issue. The government can raise questions about whether those were colectivos. We know that they were because he credibly testified. His neighbors wrote sworn statements at great personal risk and sent them to him from Venezuela to support his case, to provide that testimony. There's no question that they are looking for him. There's no question that his fear is objectively reasonable. Even if we're applying the highest standard of review and giving deference to the board and the immigration judge here, petitioner should still prevail. The evidence is that compelling here. Thank you, your honors. I'm out of time. Thank you, Ms. Waterhouse. Thank you, Mr. George. I appreciate the briefing and the oral argument in the case. This concludes the cases on the docket for this panel for this week. Those which have been orally argued, in addition to those which were submitted, non-orally argued, are now submitted to the panel for decision. Having said that, this panel stands adjourned.